UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ANGIE S. TAYLOR,

        Plaintiff,

v.

CITY OF FRIDLEY and JON HAUKAAS,[1]

        Defendants.

Case No. 08-CV-5175 (PJS/JSM)

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

---

Stephen W. Cooper and Stacey R. Everson, THE COOPER LAW FIRM, CHARTERED, for plaintiff.

Julie A. Fleming-Wolfe, FLEMING-WOLFE LAW OFFICE, for defendants.

After working for ten years for the City of Fridley, Angie Taylor was fired after she

refused to chip wood on a Friday and instead asked to chip wood on the following Monday.

Taylor brings claims against Fridley and Jon Haukaas, the supervisor who decided to fire her, for

sex discrimination, disability discrimination, and retaliation.[2]  Fridley and Haukaas move for

---

[1]Although the complaint names "John Haukaas" as a defendant, the record reveals that Haukaas's first name is "Jon."  The Court has directed the Clerk to amend the official caption accordingly.

[2]In her complaint, Taylor also asserts claims for assault and battery (Count Four) and negligence (Count Five), but Taylor agreed to drop those claims at the summary-judgment hearing and in a letter filed after the hearing.  *See* Docket No. 38.  Taylor also agreed at the hearing to drop her claims against Haukaas and to proceed only against Fridley.  The Court therefore dismisses all of Taylor's claims against Haukaas, as well as Taylor's claims for assault and battery and for negligence against Fridley.

Taylor's complaint also includes claims for "aiding and abetting" with respect to each of the substantive claims in the complaint.  But as Fridley points out in its summary-judgment brief, Fridley cannot be liable for aiding and abetting itself.  Def. Mem. Supp. Mot. S.J. ("Def. SJ

(continued...)

summary judgment. For the reasons that follow, the Court grants summary judgment on the disability-discrimination claim, but denies summary judgment on the sex-discrimination and retaliation claims.

## I. BACKGROUND

The facts, taken in the light most favorable to Taylor, are as follows:

Taylor worked for the streets division of the Fridley public-works department for roughly ten years, from 1997 to 2007. Taylor Aff. ¶ 1 [Docket No. 31]. In addition to the streets division, the public-works department included four other divisions: water, sewer, parks, and fleet. Haukaas Dep. at 29.[3] All told, these divisions employed between twenty-five and thirty full-time field workers. *Id.* at 30-31. From at least 1997 to 2007, all of these field workers — save Taylor — were men. Haukaas Dep. at 12, 31, 46-49.

The streets division included nine field workers, one of whom was a supervisor who reported to the head of the public-works department. Jensen Dep. at 32, 301-02;[4] Haukaas Dep. at 30. The head of the public-works department, in turn, reported to the city manager. Haukaas Dep. at 203-04. During the period relevant to this lawsuit, Jeff Jensen supervised the streets division; Jon Haukaas was the head of the public-works department; and Bill Burns was the city manager.

---

[2](...continued)
Mem.") at 26 [Docket No. 15]. Taylor did not respond to this argument. The Court therefore dismisses Taylor's "aiding and abetting" claims.

[3]The complete transcript of the deposition of Jon Haukaas was filed by Taylor in two parts, as Docket Nos. 35 and 36.

[4]Excerpts from the transcript of the deposition of Jeffrey E. Jensen were filed as Exhibit 2 to the affidavit of Julie Fleming-Wolfe [Docket No. 16].

Streets-division workers were assigned a wide variety of tasks. According to an official job description from 2005, they made various repairs to streets (e.g., patched holes, filled cracks, applied sealcoating); plowed snow and applied salt and sand to streets in winter; cleaned streets; and repaired, replaced, and painted street signs and pavement markings. Pl. Ex. A;[5] *see also* Jensen Dep. at 32-33. As part of their duties, streets-division workers operated various pieces of heavy equipment, such as pavers. Jensen Dep. at 34-35, 64.

The streets division also included a wood shop and a sign shop. Generally the three most-senior employees worked in these shops, two in the wood shop and one in the sign shop. Since at least 2004, Craig Turbak and Bud Zurbey worked in the wood shop, and Mike Graves worked in the sign shop. Jensen Dep. at 42, 53-54. But wood-shop and sign-shop work was not full-time, and so Turbak, Zurbey, and Graves also did the kind of work assigned to the other streets-division employees. Jensen Dep. at 50. It should also be noted that, although Turbak, Zurbey, and Graves happened to be the three most-senior employees in the streets division, the streets division ceased being unionized in about 2002, and from that point forward nothing required the streets-division supervisor to make job assignments according to seniority. Jensen Dep. at 38-39, 54. Apparently, though, that was Jensen's general practice.

Importantly for this case, streets-division workers were required to trim trees and chip wood,[6] even though these tasks are not mentioned in the 2005 job description. Chipping was generally done by a two- to four-person crew. Jensen Dep. at 37, 55-58; Taylor Dep. at 105-06,

---

[5]Plaintiff's exhibits A through M were filed without an accompanying affidavit as Docket No. 21.

[6]The Court will use "chipping" as shorthand for "trimming and chipping."

110.[7]  Typically, only the four least-senior employees were required to do any chipping.  Taylor

Dep. at 106-08.  Turbak, Zurbey, and Graves — the three most-senior employees — rarely did

chipping.  Jensen Dep. at 45, 54; Bradseth Dep. at 38-40.[8]

Up until her last month of employment, Taylor was never subject to any discipline.

Indeed, Jensen — who worked alongside Taylor from 1997 to 2004 and supervised Taylor from

2004 until Haukaas fired her in 2007 — described her as generally a good worker.  Jensen Dep.

at 81-82.  Jensen thought that Taylor did "very well" or "excellent" in operating pavers and

loaders and in plowing, digging, and grading.  *Id.* at 82.  According to Jensen, Taylor had some

difficulty only with operating the street sweeper.  *Id.* at 82-83.

Taylor did not, however, receive the same training on the division's equipment as her

male coworkers.  For instance, Scott Bradseth, who was less senior than Taylor, was trained to

use an asphalt saw before she was.  Taylor Dep. at 41-42; Taylor Aff. ¶ 5.  On the day that her

coworkers were trained to use a large sweeper, Taylor missed most of the training because she

had been sent on an errand to get chipper blades sharpened.  Taylor Dep. at 58-59.  Taylor was

trained on a smaller sweeper after coworkers had already been trained on it and only after

expressly requesting the training.  *Id.* at 23-24, 59; Taylor Aff. ¶ 5.  Taylor did not receive

training on the paver comparable to the training received by her coworkers, and she received the

training only after repeatedly asking for it.  Taylor Dep. at 68-70; Taylor Aff. ¶¶ 5-6.  On one

_____

[7]Excerpts from the transcript of Taylor's deposition were filed as Exhibit 1 to the affidavit of Julie Fleming-Wolfe.

[8]Excerpts from the transcript of the deposition of Scott B. Bradseth were filed as Exhibit 7 to the affidavit of Julie Fleming-Wolfe.

occasion, Jensen told Taylor that "girls cannot run equipment." Taylor Aff. ¶ 4. Jensen also suggested that it would be illegal to train a woman on the paver. *Id.*

Jensen did not treat Taylor with the respect she expected to receive based on her seniority. As a general rule, the most-senior employee on a work crew was considered the "crew chief." Taylor Dep. at 42-44. When Jensen needed to communicate with a work crew, if the crew chief was anyone other than Taylor, Jensen went through the crew chief. *Id.* at 57. But on one occasion, when Taylor was crew chief on a water-main break, Jensen came to the job site and spoke with a junior employee. *Id.* at 55. And when Taylor was in charge of tree-trimming crews, Jensen would occasionally communicate with junior members of Taylor's crew rather than with Taylor. *Id.* at 56.

Taylor's coworkers sometimes received information during informal meetings to which she was not invited — meetings that were held in the men's locker room. *Id.* at 65-66. Taylor would often not receive the information shared at these meetings. The morning meeting for the streets division, which Taylor attended, was also held in the men's locker room until, in response to Taylor's complaints, the meeting was moved to the lunchroom. *Id.* at 65.

Taylor's coworkers, including Jensen, shunned her. As Taylor put it, "I was the red-headed stepchild. . . . I was the girl that they didn't want around." *Id.* at 54. Specifically, when a crew had to drive from the central building to a job site, her coworkers would run to their trucks so that they would not have to ride with her. *Id.* at 77. They would avoid her at lunchtime. *Id.* at 78. And they did not include her in their conversations. As she put it, if Jensen and her coworkers were chatting idly at a job site, "[i]f I moved over towards the men and their communications, they moved away like a flock of birds." *Id.* at 53-54.

For much of the time that Taylor worked in the streets division, sexually themed material was present in the workplace.  Calendars that depicted scantily clad women were displayed openly in streets-division dump trucks as late as March 2007.  *Id.* at 33; Taylor Aff. ¶¶ 19, 56. Jensen admitted that he hung such calendars in his city-assigned dump truck, as did some coworkers.  Jensen Dep. at 103-04.  And pornographic magazines were kept in a cabinet in the wood shop.  Taylor Aff ¶ 21; Taylor Dep. at 33.  One of Taylor's coworkers, Bud Zurbey, acknowledged that he put Playboy magazine in the cabinet, that there were harder-core magazines there as well, and that the magazines were there for years.  Zurbey Dep. at 29-30.[9] Jensen, Taylor's supervisor, knew about the magazines and did not order them removed until 2006 or 2007.  Zurbey Dep. at 32.

Further, Taylor's coworkers regularly made sexist remarks.[10]  Zurbey told college students working in the summer "to screw as many females as they could and then marry a virgin."  Taylor Dep. at 82; Taylor Aff. ¶ 17.  While driving, Taylor's coworkers would remark on women they saw.  Taylor Dep. at 82 ("[A] lot of the guys while just driving around would [say], oh, there's some sugar.  There's a honey.  The comments were common and often.").  Her coworkers broadcast "hottie report[s]" to each other, went out of their way to drive by city

---

[9]Excerpts from the transcript of the deposition of William A. Zurbey were filed as Exhibit 6 to the affidavit of Julie Fleming-Wolfe.

[10]Taylor also attributes sexist remarks to Gregg Kotsik, who was apparently a supervisor in the sewer division of the public-works department.  Kotsik told Taylor that apples and oranges should be kept separate, which Taylor took to mean that men and women should not work together.  Taylor Dep. at 80; Taylor Aff. ¶ 24.  Kotsik also recommended to the parks-division supervisor that he narrow the number of applicants for a job by ignoring those with names like "Jane" or "Jill."  Taylor Dep. at 80; Taylor Aff. ¶ 15.  When he made this remark, Kotsik looked at Taylor and laughed.  Taylor Aff. ¶ 15.

beaches in the summer to leer at women, and regularly drove by the house of a woman they had once seen naked in her home. Taylor Dep. at 78-79. They would also refer to women as lazy, stupid, incompetent, and worthless. Taylor Dep. at 79; Taylor Aff. ¶ 16.

When Taylor complained, she was not taken seriously. Once, when working on a crew led by Zurbey, Taylor criticized her coworkers' treatment of her and their ogling of women while on the job. Taylor Dep. at 126. Zurbey responded by saying that he and a friend, when they worked a city liquor store, had gotten a female supervisor fired by making up lies about her. Taylor Dep. at 126-27; Taylor Aff. ¶ 20.

On a different occasion (sometime between 2004 and 2007), Taylor complained to Jensen about how she was being treated. Taylor Dep. at 70-71. When Taylor asked Jensen what was "so bad about a girl working here," he replied, "I wouldn't want my wife to work here. Then I'd have to do her job and mine." Taylor Dep. at 71.

Taylor also complained to both Burns and Haukaas, who, respectively, did nothing and next to nothing in response. Taylor told Burns, shortly after she started working for Fridley, that she was being treated differently from men in her division, and he responded dismissively. Taylor Dep. at 36 ("I told [Burns] that I was not being treated the same as the men. And I told him some of the things that were going on, examples. And his response was, oh, they're being mean to you, tsk tsk tsk. He made that clicking noise."). Taylor complained to Burns a second time, at a public function, and Burns said nothing more than "huh" or "hmm" in response. *Id.*

Sometime after Jensen took over as supervisor of the streets division in 2004, Taylor complained to Haukaas that her coworkers did not want to talk to her, eat with her, or ride in trucks with her. Haukaas Dep. at 28, 32. Haukaas did not report Taylor's complaint to the

human-resources department. Haukaas Dep. at 33. He investigated by talking to two or three employees in the streets division. Haukaas Dep. at 34. Haukaas had the impression that Taylor's coworkers were, in fact, avoiding her as she said. Haukaas Dep. at 35-36. Jensen confirmed this impression and confirmed that he was aware of how Taylor's coworkers treated her. Haukaas Dep. at 37.

According to Haukaas, the streets-division employees to whom he talked said that they avoided Taylor because "she was trying to always enter into argumentative conversations with them about sensitive issues, whether it was politics or religion or even sex and gender, and they weren't comfortable talking about it." Haukaas Dep. at 34. Haukaas did not ask these employees whether Taylor, in these argumentative conversations, was complaining of sex discrimination. Haukaas Dep. at 49. Haukaas did not ask Jensen to take any action in response to Taylor's complaints. Haukaas Dep. at 37. Instead, Haukaas told the two or three coworkers to whom he spoke that "they had to work together; that they had to be cordial. I said, 'You don't have to talk to her, but you do have to discuss anything related to work and make sure the job gets done.'" Haukaas Dep. at 36. Haukaas did not follow up with Taylor to let her know what he had done about her complaints. Haukaas Dep. at 50-51.

In late 2005, a severe storm in the Fridley area knocked down many trees and tree branches. Taylor Aff. ¶ 37. As a result, there was more chipping work than usual. Taylor Dep. at 153. Taylor did her assigned chipping work, but while chipping, she began to develop severe headaches, fatigue, difficulty breathing, and mucus buildup and discharge in her ears and nose. Taylor Dep. at 94-95; Taylor Aff. ¶¶ 37-38. She had not previously had such symptoms when

chipping. Taylor Dep. at 96. Taylor tried wearing paper masks and drinking water to alleviate her symptoms while chipping in late 2005 and early 2006. Taylor Dep. at 130; Taylor Aff. ¶ 39.

In February 2006, Taylor asked Jensen to take her off of chipping duty, at least temporarily, because of her symptoms. Taylor Dep. at 130 ("I asked for him [i.e., Jensen] to get away from the tree trimming for a couple of weeks to get healthy. I was sick all the time."); Taylor Aff. ¶¶ 38, 40. Jensen told Taylor that she would have to fill out an official "report of injury" form and follow procedures for seeking workers' compensation. Taylor Dep. at 130; Taylor Aff. ¶ 40.

Jensen and Taylor filled out their portions of a report-of-injury form dated February 16, 2006. In the supervisor's portion of the form, Jensen wrote: "When [Taylor] uses the chipper she gets watery eyes, runny nose, sneezing and sometimes it gets hard to breath[e] in the last 3 months. Has tried preventive measures of drinking more water, using a mask and [S]udafed [and] Benadryl. None has helped her." Pl. Ex. B at 2. Taylor described her problems in similar terms.[11] Jensen and Taylor gave December 1, 2005, as the date the condition began, and on the first page of the report-of-injury form, Taylor wrote, "It is not an injury per se. I have had physical ailments or symptoms that ha[ve] worsened over time, while using the chipper." Pl. Ex. B at 1.

The same day, Taylor called the worker's-compensation hotline for Fridley's health-care provider, HealthPartners. Def. Ex. 10. She made an appointment for that afternoon with

---

[11]Taylor wrote: "When I use the chipper I get watery eyes, runny nose, sneezing and sometimes it gets hard to breathe. Within the past 3 months [*sic*]. I have personally attempted to take preventative measures by: (1) consuming more water[,] (2) [?] mask during chipper[,] (3) Sudafed — Dimetap[p] — Benadryl. None has helped me to be able to safely perform my duties." Pl. Ex. B at 3.

-9-

Dr. Cyril Kapsner. Kapsner's record of Taylor's February 16 visit is titled "Activity Plan/Work Ability" and, under the heading "Able to do," Kapsner wrote: "*No chipping work*. Avoid exposure to sawdust." Def. Ex. 9 (emphasis added). Kapsner diagnosed Taylor with wheezing and allergic rhinitis and prescribed medicines for allergies and asthma.[12] Kapsner said that Taylor should come back in four weeks and should limit her activities as indicated until her next scheduled visit. Under the heading "Maximum Medical Improvement" Kapsner wrote "No," indicating that Taylor's condition might improve. *Id.*

Taylor did not see Kapsner again until April 26, 2006, almost ten weeks later. The record of this visit, again titled "Activity Plan/Work Ability," is identical in a key respect to the record of the February 16 visit. Under the heading "Able to do," Kapsner again wrote: "*No chipping work*. Avoid exposure to sawdust." Def. Ex. 11 (emphasis added). But the record of the April 26 visit differs from the previous record in two notable respects. First, under the heading "Maximum Medical Improvement," Kapsner wrote "Yes," indicating that Taylor's condition was

_____

[12]Kapsner wrote: "Use [N]asonex daily and albuterol inhaler as needed. Take [C]laritin, 1 pill a day as needed." Def. Ex. 9. Nasonex is a brand name of mometasone nasal spray, a prescription drug that "is used for the treatment and prevention of nasal symptoms of seasonal and year-round allergies, including runny nose, sneezing, and itchy nose. Mometasone nasal inhalation is in a class of medications called topical steroids." Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Mometasone Nasal Inhalation," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602024.html (last visited Aug. 3, 2009). Albuterol is a prescription drug that "is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease . . . . Albuterol is in a class of medications called bronchodilators." Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Albuterol Inhalation," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html (last visited Aug. 3, 2009). Claritin is a brand name of loratadine, an over-the-counter antihistamine used to treat allergy symptoms. Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Loratadine," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html (last visited Aug. 3, 2009). Copies of all Internet materials cited in this opinion have been docketed separately in the Court's CM/ECF system.

not likely to improve.  *Id.*  Second, Kapsner directed Taylor to return "[a]s needed"; he did not

direct her to schedule another visit.  *Id.*

From February 16, 2006 to August 2006, Taylor was not asked to do any chipping.

According to Haukaas, this did not create any problems for Fridley.  Haukaas Dep. at 83.

Sometime in August 2006, Taylor took leave to have surgery for endometriosis.[13]  Taylor Aff.

¶ 42; Def. Ex. 12.  She returned from leave in early October 2006.

In the fall of 2006, Jensen changed streets-division policy and directed that chipping

always be done by a four-person crew, rather than by a crew of two to four people.[14]  Taylor Dep.

at 109.  This policy change should have had little impact on Taylor, as the streets division

employed four field workers who had less seniority than Taylor.  On October 10, 2006, however,

Taylor was assigned to do chipping, apparently because only three of the four less-senior

_____

[13]Endometriosis is a condition in which "the kind of tissue that normally lines the uterus
grows somewhere else."  Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia,
"Endometriosis," http://www.nlm.nih.gov/medlineplus/endometriosis.html (last visited August 3,
2009).

[14]Fridley asserts that under Jensen's predecessor as supervisor, "the tree trimming was
done by the four least senior employees.  When Jensen became [s]upervisor, he assigned the five
least senior workers to the tree trimming crew on a rotating three weeks in, one week out
schedule so each employee had a week off of the duty."  Def. SJ Mem. at 4.  This assertion may
be true, but the citations given by Fridley provide no support for it.  Jensen testified that he "tried
to do things a little more equally" than his predecessor, Jensen Dep. at 41, but nowhere in the
cited passages of his deposition did Jensen say anything about the purported "three weeks in, one
week out" schedule described in Fridley's brief.

Further, Taylor's description of the staffing change is at odds with Fridley's.  According
to Taylor, the change happened when she returned from surgery in 2006, not when Jensen took
over as her supervisor, and the change involved moving from under-four-person crews to four-
person crews, not making a fifth person eligible to rotate into already-required four-person crews.
Taylor Dep. at 109 ("He changed the norm from two to four people to be a minimum of four
people to include me, the female . . . .").

employees were at work. Taylor Aff. ¶ 42; Taylor Dep. at 113. Under the earlier policy, the three less-senior employees could have chipped without Taylor — but, under Jensen's new policy, Taylor was asked to fill out the four-person crew. Taylor Dep. at 105-06 ("Tree trimming has been done by as little as two people and up to four people, two people in each vehicle. They have always done this. Oftentimes, I have tree trimmed as a two-person team or a three-person team.").

Taylor objected to the assignment, and Jensen told Haukaas about Taylor's unwillingness to chip. Haukaas Dep. at 85-86. Haukaas and Deborah Dahl of Fridley's human-resources department met with Taylor later that day to discuss the situation. Haukaas Dep. at 90; Def. Ex. 13. Following that meeting, Dahl drafted a letter to Kapsner asking for further information about Taylor's medical condition. Def. Ex. 13; Pl. Ex. E. Attached to the letter were an official job description for Taylor's position and a table of "Job Activity Requirements." Pl. Ex. E. Though neither the job description nor the job-activity-requirements table mentioned tree trimming or wood chipping, in the letter, Dahl said that Taylor's position required her "to cut, trim, and chip trees and bushes for three to five (3-5) days per week, up to eight (8) hours per day, for at least three (3) months out of the year. [Taylor] would be regularly exposed to saw dust, debris, and wood particles for that amount of time." Pl. Ex. E at 1.

Dahl asked Taylor to forward the letter to Kapsner. Def. Ex. 13. Taylor could not get an appointment with Kapsner, so on October 16, 2006, Taylor went to a different doctor, Dr. Elaine M. Francis. Taylor Dep. at 137; Pl. Ex. E. Francis responded to the questions in Dahl's letter by fax the next day. Pl. Ex. E at 11-13. Francis's responses are not entirely consistent.

In response to a question about the "nature, severity, and anticipated duration" of Taylor's impairment, Francis said: "[P]atient has allergic rhinitis, which causes headache, runny nose; and has obstructive lung disease, possibly asthma. [T]hese are *permanent conditions* and asthma *may* be life threatening." Pl. Ex. E at 12 (emphasis in original). But Francis checked the box for "Yes" in response to the question, "Is [Taylor] now able to work eight (8) hours per day in an outdoor setting, cutting, trimming and chipping trees in the required time frame (minimum 3-5 days per week, up to 8 hours per day for a period of up to three months)?" *Id.* at 13. When asked to describe Taylor's restrictions with respect to such activity, Francis said that Taylor "should be taking Advair inhaler and Claritin while exposed to trees/sawdust." *Id.* But in response to a question about what type of "reasonable accommodation (such as providing personal protective equipment)" would allow Taylor to do "the essential functions" of her job, Francis said: "There is *no* 'personal protective' equipment that I am aware of[] that will keep allergens out." *Id.* (emphasis in original).

According to Taylor, when she and Jensen discussed Francis's findings, Jensen reported that management "freaked out" at the mention of asthma. Taylor Dep. at 138. Jensen told Taylor that she could not be on "permanent restriction." *Id.* Taylor took this to mean that if she could not do chipping, she "no longer had a job there." *Id.* at 139.

Haukaas and Dahl found Francis's findings confusing. Dahl Dep. at 287;[15] Haukaas Dep. at 101. But based on Francis's report, Taylor was temporarily excused from chipping, and Fridley arranged an independent medical examination ("IME") in consultation with the city's

_____

[15]Excerpts from the transcript of the deposition of Deborah K. Dahl were filed as Exhibit 4 to the affidavit of Julie Fleming-Wolfe.

worker's-compensation insurer. Dahl Dep. at 293-95. Dr. Jeffrey H. Mandel, an occupational-medicine specialist and epidemiologist, conducted the IME on December 29, 2006. Def. Ex. 14. In his IME report, Mandel said that Taylor suffered "non-specific rhinitis" resulting from "an irritant reaction to wood dust or components of it . . . ." *Id.* at 4. Mandel reported that it was "possible, but less likely," that Taylor was actually allergic to wood, and he noted, "[t]here has been no history of asthma in Ms. Taylor, nor were her pulmonary function tests abnormal on two occasions in 2006." *Id.* Mandel said that Taylor was likely to have further symptoms of headache, runny nose, congestion, and watery eyes upon exposure to wood dust, and that such symptoms were associated with "significant discomfort" and could "interfere with Ms. Taylor's job performance and safety." *Id.* at 5.

With respect to Taylor's ability to do chipping, Mandel said: "If woodcutting and chipping are part of her job requirements, it is my opinion that additional follow-up and possible treatment will be needed to determine whether she is able to perform those activities." *Id.* at 4-5. In particular, when asked whether Taylor could do chipping for eight hours per day, Mandel said:

> It is my opinion that, at this time, Ms. Taylor may be able to work for the required time in the outdoor setting cutting and chipping trees. However, it is also my suggestion that, if this type of work were to be undertaken, she should have *close follow-up before and during the tree trimming/chipping activities by an occupational physician*. . . . [I]t may be helpful to phase her into this type of work, starting with an hour or two per day and increasing the time, as per her symptoms. Another part of the follow-up care is to monitor her symptoms and treat her as needed. It is also suggested for her occupational physician to consider additional testing to determine a more precise diagnosis, with the consideration of an allergic condition . . . . If her symptoms worsen during this time, and if additional diagnostic tests or treatments are not helpful in the management of her condition, it is my suggestion that additional consideration be given to her work disposition. Accordingly, at

this point, I do not feel that a final comment about her MMI (maximum medical improvement) status is possible.

*Id.* at 6 (emphasis added).  And in response to a question asking what reasonable accommodation Fridley could provide to enable Taylor to do the "essential functions" of her job, Mandel responded:

> If cutting and chipping are essential functions in her job (it is not described as such in the "Fridley Job Activity Requirements" provided with the records that I reviewed), it is possible that Ms. Taylor could benefit from a respirator.  This should be used on a trial basis.  I would suggest that this be done under the guidance of a certified industrial hygienist . . . .  Many individuals obtain benefit from respirators in this setting.  However, some individuals have difficulty using them, and find that they interfere with work activities.  In regard to the ongoing use of a respirator, additional accommodations may be needed in the future, after further monitoring of Ms. Taylor by an industrial hygienist and an occupational physician.

*Id.*

Based on Mandel's IME report, Dahl and Haukaas determined that Taylor should be fitted with a respirator and should resume chipping work.  They did not arrange any additional followup by an occupational physician, but Dahl and Haukaas did arrange for an industrial hygienist to work with Taylor to identify a respirator that she could wear.  Haukaas Dep. at 139-40, 146-48; Def. Ex. 15.

In late January 2007, Haukaas wrote Taylor a memo discussing Mandel's IME, explaining that an industrial hygienist was scheduled to review respirators with Taylor, and warning Taylor, "[i]f you do not wear your respirator as required, you will be in violation of a direct order and will be disciplined."  Def. Ex. 15 at 2.  With respect to the IME, Haukaas said that Mandel's "analysis has not put any restrictions on your work activity as a result of these

symptoms." *Id.* at 1. Haukaas said that "working in an environment that creates wood dust is a significant part of your job" and that Taylor would not be excused from chipping. *Id.*

The industrial hygienist — a consultant named Janet Keyes — met with Taylor and Jensen on January 22, 2007. Def. Ex. 16. Keyes brought several respirators with her, but none fit Taylor. Keyes met with Taylor again on February 2 to try on respirators, and again, none of them fit. Def. Ex. 16; Def. Ex. 20. In fact, according to a memo dated February 5 from Keyes to Dahl, of the nineteen respirators tried at that point, only three of them fit well enough to do what is called a "fit test," and those three failed the test. Def. Ex. 17. (A "fit test" is apparently a procedure in which a person wearing a respirator is asked if she can smell deliberately produced odors.) Keyes explained that Taylor "needs a small respirator" but "most of the ones I've tried have been the more readily available mediums." *Id.* at 2.

Also on February 5, Keyes raised with Dahl the possibility of trying a "loose fitting powered air purifying respirator (PAPR)" because such respirators "are not dependent on fit." *Id.* at 1. Haukaas arranged another meeting with Keyes to look at respirators for the morning of Friday, February 9, 2007. *See* Def. Ex. 18.

Before that meeting occurred, however, Taylor went to see Burns, the city manager, on February 7 to complain about how she was being treated. She complained both about how her chipping-related health problems were being handled and about sex discrimination in the streets

division.  Taylor Aff. ¶ 56; Burns Dep. at 27-28.[16]  Taylor gave Burns a copy of a calendar featuring scantily clad women that she had taken from one of the division's dump trucks.  Taylor Aff. ¶ 56.

Burns told Haukaas that Taylor had come to see him.  Haukaas Dep. at 166.  Haukaas, in turn, told Jensen, and Haukaas suggested that Taylor should be disciplined for having met with Burns.  Jensen Dep. at 173, 187.  Haukaas had never before taken a personal interest in the whereabouts of any of Jensen's subordinates.  Jensen Dep. at 197.

On February 8 (the day after Taylor's meeting with Burns), Haukaas and Jensen met with Taylor, and Haukaas told Taylor that she should not have gone to see Burns.  Haukaas criticized Taylor for leaving work without permission and for taking her complaints outside the chain of command.  Jensen Dep. at 177, 189-90; Taylor Aff. ¶ 57.  Taylor did not agree that she had left work when she visited Burns, and Haukaas acknowledged that if Taylor had come to see

---

[16]When asked at his deposition about this meeting, Burns said that his conversation with Taylor

> was not focused or . . . comprehensive in nature, coherent in nature. . . . [S]he was upset with being required to trim trees and with the arrangements that were being made for wearing masks as an antidote to her allergies, her rhinitis . . . .  She did . . . tell me about some, what I would characterize as salacious material that she found in a truck.  I thought she was talking about a . . . Playboy magazine or something like that, but that's it. . . .  She talked about other employees not being required to do tree trimming and — such as the employee that makes signs. . . .  And she felt that, you know, she shouldn't have to do tree trimming.

Burns. Dep. at 27-28.
    Excerpts from the transcript of Burns's deposition were filed as Exhibit 5 to the affidavit of Julie Fleming-Wolfe.

Haukaas rather than Burns, she would not have been deemed to have left work. Jensen Dep. at 200; Haukaas Dep. at 203.

At this same February 8 meeting, Haukaas directed Taylor to show up for the respirator-fitting session with Keyes scheduled for the next day. Taylor Aff. ¶ 58; Jensen Dep. at 219. Taylor expressed concerns about wearing a respirator and was told, in response, that she had to wear a respirator if she wanted to keep her job. Taylor Aff. ¶ 58; Taylor Dep. at 140 ("That whole conversation [Haukaas] threatened my job several times during that.").

After this meeting, Taylor was upset. She told Jensen in person that she would be taking the next day off as a personal day because of the stress she was feeling from Haukaas's threats. Taylor Dep. at 140, 171; Taylor Aff. ¶ 59. Later that night, around 11:00 p.m., Taylor left a message on Jensen's voice mail reiterating that she would not be reporting for work the next day. Jensen Dep. at 218; Taylor Dep. at 171; Taylor Aff. ¶ 59. As a general rule, streets-division employees could take personal days whenever they wanted as long as they called in ahead of time. Taylor Dep. at 172; Taylor Aff. ¶ 61; Haukaas Dep. at 195, 206.

The next day, February 9 (a Friday), Taylor did not show up for work. Jensen told Dahl and Haukaas about Taylor's absence, and Haukaas tried to reach Taylor at home and on her work-issued cell phone. Jensen Dep. at 219-21; Haukaas Dep. at 207; Def. Ex. 18. Haukaas was unable to reach Taylor, and Haukaas, Jensen, and Dahl went ahead and held the scheduled meeting with Keyes to talk about respirators. Jensen Dep. at 222-24; Def. Ex. 18. Keyes recommended getting Taylor a powered air-purifying respirator ("PAPR") of the kind Keyes had mentioned in her February 5 email to Dahl. *See* Def. Exs. 17-18. The PAPR did not require fit testing. Def. Ex. 18.

Keyes told Dahl that an occupational physician would "be the ultimate authority" on whether the PAPR would be appropriate for someone with asthma or lung disease, but that Keyes thought that it would work. Def. Ex. 18 at 1. Keyes said that an occupational physician would need to certify that Taylor could wear the mask, and that Keyes would train Taylor on how to use it. *Id.* Dahl scheduled a training session with Keyes and Taylor for Wednesday, February 14, 2007. *Id.* at 2. Dahl also talked to a representative of Fridley's worker's-compensation insurer, and Dahl left a message with a medical provider, Multicare Associates, to arrange a consultation about the PAPR with an occupational physician. *Id.*

When Taylor came to work on the morning of Monday, February 12, Haukaas handed her a written reprimand in front of the entire streets division. Taylor Dep. at 140-41; Def. Ex. 19. This was the first written reprimand Taylor ever received. Haukaas Dep. at 174. This was also the first written reprimand ever given by Haukaas to a streets-division worker or to any other non-supervisory field worker in the public-works department. Haukaas Dep. at 187-88. In the written reprimand, Haukaas criticized Taylor for having "left work without informing anyone" on February 7. Def. Ex. 19. Haukaas has never reprimanded any employee, before or since, for leaving work without notifying a supervisor. Haukaas Dep. at 186. And Haukaas knew when he issued the reprimand that Taylor had met with Burns on February 7, and that Burns had an open-door policy toward city employees. *Id.; see also* Taylor Aff. ¶ 56. Haukaas also criticized Taylor in the written reprimand for "taking an unscheduled personal day" on February 9 and thus missing the scheduled respirator-fitting meeting with Keyes on February 10. Def. Ex. 19.

Taylor met with Keyes as scheduled two days later, on Wednesday, February 14. *See* Def. Ex. 20. Keyes brought a PAPR with her for Taylor to see. *Id.* at 2. This particular PAPR

had a belt-mounted battery, filter, and blower for propelling filtered air through a hose to a face shield attached to a hardhat. *Id.* Taylor told Keyes that the PAPR would not be feasible for her given that Taylor had to frequently get in and out of a truck and an aerial lift bucket when chipping. *Id.* In a memo to Dahl following the meeting, Keyes discussed two other types of respirators that they could try but pointed out those respirators' disadvantages.[17]

The next day, February 15, Taylor was seen by an occupational physician, Dr. Orrin Mann, at a consultation arranged by Dahl "with respect to Ms. Taylor's ability to use a respirator." Pl. Ex. F. at 1. In a letter to Dahl, Mann reported that Taylor's medical condition "does not preclude her from using a respirator." *Id.* But Mann also noted that Taylor may have a "stress/anxiety/claustrophobia problem which many people do report when using respirators," and that Taylor "has concerns about safety in a hazardous environment while working in trees and using dangerous equipment." *Id.* Based on his meeting with Taylor, Mann recommended the following to Dahl:

> [Taylor] should be able to wear a cartridge or dust type respirator provided one with proper fit can be found. If that is not possible she is medically capable of wearing a supplied air respirator *if that is determined by your safety people* to be an appropriate thing for her to use.
>
> One must be cognizant of the potential dangers that these respirators will pose in the environment in question, not only because it is cumbersome and can get in her way and can obstruct her vision, but it can also impair her ability to hear others and to communicate with them. *I will leave it to your safety people and*

---

[17]As one alternative, Keyes described a type of PAPR in which the blower, battery, and filter are incorporated into the helmet, rather than mounted on a belt. But such helmet-mounted PAPRs are heavy. Keyes also mentioned a full-face, blower-less respirator, but said that such respirators are not compatible with sunglasses (which Taylor said she needed to wear when chipping). Def. Ex. 20 at 3.

*your crews to determine the appropriateness of that type of respirator.*

In addition, if she is having a flare of her asthma she should not be put in an environment that could be a risk to her with a lot of dust, and she should not wear a respirator at that time either. Her doctor can document whether she is in fact having such flares, and/or whether she has been diagnosed with allergies or asthma.

Finally, people that have stress anxiety and claustrophobia often do not tolerate respirators well. A trial and error period is reasonable however to see how well she does with that.

Pl. Ex. F at 1-2 (emphasis added).

As shown above, in his letter to Dahl, Mann twice deferred to Fridley's "safety people" on the issue of whether Taylor could safely wear a PAPR while chipping. Taylor felt that the PAPR was a safety hazard and expressed this concern to Keyes, pointing out that the hose could get snagged on tree branches. Taylor Dep. at 158. Haukaas was aware of this concern. Haukaas Dep. at 296. Nonetheless, although Fridley had a safety consultant available through its worker's-compensation insurer, Haukaas never asked that consultant for an opinion about whether Taylor could safely wear the PAPR while chipping. Haukaas Dep. at 305. Instead, Haukaas decided that the PAPR was no different from gear such as gloves, hardhats, and face shields that employees already wore when chipping. Haukaas Dep. at 299, 307-09.

After a couple of weeks of relative calm, Taylor wrote a letter on March 6, 2007 to Haukaas, Dahl, Burns, and the Fridley City Council challenging Haukaas's February 12 written reprimand of her. Def. Ex. 21. Taylor asked for "full disclosure" of her appeal rights so she could "follow the proper grievance procedure"; she disputed that she "left work" on February 7 when she met with Burns; she disputed events surrounding her missing work on February 9 (when she took a day off because of the stress caused by her February 8 meeting with Haukaas

and Jensen); and she described the February 12 reprimand as "retaliation or reprisal" for having complained to Burns. *Id.* Specifically, Taylor said: "I am the only female working in the streets department. I am concerned the current adverse actions are the result of discrimination and/or retaliation or retribution. As such, I am requesting full disclosure of my rights for protection in all of these areas as well." *Id.*

Haukaas never discussed this letter with Taylor. Haukaas Dep. at 211-12. Neither Haukaas nor anyone else investigated Taylor's allegations of retaliation. Haukaas Dep. at 218-20. And there is no evidence that anyone provided Taylor the information that she requested about the applicable grievance procedure and her appeal rights. *See* Haukaas Dep. at 212-13.

A week after Taylor sent her letter, however, Dahl asked Taylor to sign a memo titled "Return to Work Plan." Def. Ex. 22. The memo said that Keyes's final recommendation was that a PAPR "would be effective and safe." *Id.* at 2. But Keyes did not actually say that Taylor could safely do chipping while wearing the PAPR, and it is not clear that Keyes would have been qualified to offer an opinion on industrial safety. *See* Def. Ex. 20 at 2 (letter from Keyes noting, without comment, Taylor's objection that the PAPR "would not be feasible in her work environment"); Taylor Dep. at 188 ("[Keyes] told me that [safety] would have to be up to OSHA. She didn't cover that aspect of it. Her job was to come in and fit the respirators to me."). The memo also said that Mann cleared Taylor to wear an appropriately fit-tested PAPR. Def. Ex. 22 at 2. But on the question of the PAPR's safety in the context of chipping work, Mann expressly deferred to Fridley's "safety people." Pl. Ex. F at 1-2.

In any event, the "Return to Work Plan" informed Taylor that the city was going to provide her a PAPR and that once Taylor was trained to use it, she would have to keep it with her

at all times and wear it when chipping. Def. Ex. 22 at 2. Taylor, Haukaas, Dahl, and Jensen all signed the plan on March 13, 2007. *Id.* at 3.

Three days later, on the morning of Friday, March 16, Keyes provided Taylor a PAPR and trained her on using it. Def. Ex. 23. The previous day, Taylor had discussed her schedule with Jensen, and he had said that she would not need to do any chipping until the following Monday, March 19. Taylor Aff. ¶ 63; Taylor Dep. at 159-60. Taylor had arranged an appointment with Francis, the doctor whom Taylor had seen the previous October, for that Monday. Taylor Aff. ¶ 63. Taylor had spoken to Jensen before scheduling the appointment, and he was aware of it. Taylor Dep. at 159-60, 164 ("I talked to [Jensen] before I scheduled the workman's comp. doctor's appointment because I wanted to make sure that we were all on the same page."); Jensen Dep. at 305.

As of Friday morning, Taylor was scheduled to work on a water-main break that afternoon. Jensen Dep. at 303-04. That job was cancelled, however, and Jensen then called Haukaas to say that the afternoon was open. Jensen Dep. at 304. Haukaas suggested to Jensen that Taylor should do chipping that afternoon. *Id.* Jensen told Haukaas that Taylor had set up a doctor's appointment on Monday so she could be seen after chipping, but Haukaas said that he wanted Taylor to chip that afternoon. *Id.* at 305. It was unusual for Haukaas to tell Jensen what one of Jensen's subordinates should do. *Id.* at 302.

When Jensen told Taylor that the schedule had changed, and she was supposed to chip that afternoon, Taylor protested that she wanted to wait to chip until Monday, when she could be seen by her doctor. *Id.* at 306-07; Taylor Dep. at 160. Jensen explained that the order to chip came from Haukaas. Jensen Dep. at 307; Taylor Dep. at 160. Taylor then called Haukaas to

protest. Taylor explained that she was willing to chip on Monday but did not want to do so that afternoon. Jensen Dep. at 308-09. She said that she had a doctor's appointment set up for Monday and, given that chipping gave her headaches that lasted for days, she did not know why they could not wait until Monday for her to try chipping while wearing the PAPR. Taylor Dep. at 161. Haukaas said that he didn't care and that, "if needed, he would have paramedics out there for me." Taylor Dep. at 161. After Haukaas and Taylor debated whether she was refusing to work — Taylor said that she was not refusing to work because she would do anything but chipping; Haukaas said that by refusing to chip, she was refusing to work — Haukaas sent Taylor home. Taylor Dep. at 162-63; Jensen Dep. at 309.

On Monday, March 19, Haukaas wrote Taylor a letter giving her notice that she was being fired, effective in ten days, and placing her on administrative leave for the interim. Def. Ex. 24. Haukaas said that Taylor was being fired for her refusal to chip wood while wearing the PAPR respirator that she had been fitted with the previous Friday. *Id.* at 1. Haukaas also said that the city had

> received the required certifications and recommendations from an independent medical doctor, a qualified occupational hygienist, and the City's occupational physician to proceed with the PAPR respirator. All agreed the respirator would be a safe, effective [*sic*], and would serve as a reasonable accommodation for you.

*Id.*

Taylor responded by letter on March 23, challenging her termination and the statements in Haukaas's letter. Def. Ex. 25. Taylor pointed out that on Friday, March 16, Jensen had told her that they would not be chipping. Taylor also reiterated that she had told both Jensen and Haukaas that she was willing to chip on Monday, March 19, a day on which she had arranged a

doctor's appointment. *Id.* Taylor also quoted the section of the December 2006 IME report of

Mandel in which he said that she should "'have close follow-up before and during the tree

trimming/chipping activities by an occupational physician.'" *Id.* (quoting Def. Ex. 14.) And

Taylor forwarded to someone at Fridley a doctor's note dated March 23, 2007, from Dr. Melissa

King-Biggs, that said:

> I have evaluated [Taylor] for symptoms of difficulty breathing and
> nasal congestion while exposed to wood dusts. Her evaluation to
> date is suggestive of asthma with rhinitis, possibly due to
> sensitization from proteins in wood dusts. Further testing is
> indicated to fully establish this diagnosis, including blood tests,
> Xrays and pulmonary function testing.

Def. Ex. 26.

In response, Burns affirmed Taylor's firing in a letter dated April 10, 2007. Def. Ex. 27.

Burns said that Taylor was fired because of her "inability and/or refusal to follow the reasonable

accommodation and return to work plan offered" to her. *Id.* According to Burns, Taylor

"presented no further medical information or requests for reasonable accommodations" and thus

the city had "no recourse" but to fire her, effective April 13, 2007. *Id.*

Taylor promptly filed a complaint with the Equal Employment Opportunity Commission

("EEOC") in which she alleged disability discrimination, sex discrimination, and retaliation.

Def. Ex. 28. Taylor received notices from the EEOC and the Minnesota Department of Human

Rights in June and July 2008 advising her of her right to sue. *Id.* Taylor filed this suit in state

court in August 2008, and defendants removed it to this Court soon thereafter.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. Retaliation

The ADA forbids an employer to retaliate against an employee because the employee "opposed any act or practice made unlawful by [the ADA] or because [the employee] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" conducted pursuant to the ADA. 42 U.S.C. § 12203(a). Title VII likewise forbids retaliation with respect to complaints of sex discrimination. 42 U.S.C. § 2000e-3(a). And the MHRA forbids retaliation with respect to both complaints of sex discrimination and complaints of disability discrimination. Minn. Stat. § 363A.15.

In Count Three of her complaint, Taylor appears to assert a retaliation claim only under the MHRA. Compl. ¶ 62. But elsewhere in the complaint, Taylor appears to complain of

retaliation more generally.  *Id.* ¶¶ 11, 33.  In its summary-judgment brief, Fridley did not

distinguish among the different types of retaliation claims that arguably are at issue in this case,

and Fridley cited cases involving retaliation under both the ADA and Title VII.  *See* Def. Mem.

Supp. Mot. S.J. ("Def. SJ Mem.") at 36-39 [Docket No. 15].  The Court therefore construes

Taylor's complaint to raise retaliation claims under the ADA, Title VII, and the MHRA.

The parties agree that Taylor's retaliation claims should be analyzed under the familiar

three-step framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

(1973).[18]  *See* Def. SJ Mem. at 36-37; Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 38

[Docket No. 30].  To prevail under that framework on her retaliation claims, Taylor must

establish three things: (1) that she complained of sex or disability discrimination; (2) that Fridley

took an adverse action; and (3) that the adverse action was causally related to — that is, was in

retaliation for — her complaints.  *See, e.g.*, *Mitchell v. Iowa Prot. & Advocacy Servs., Inc.*, 325

F.3d 1011, 1013 (8th Cir. 2003) (ADA retaliation); *Smith v. St. Louis Univ.*, 109 F.3d 1261,

1265-66 (8th Cir. 1997) (Title VII retaliation); *Bahr v. Capella Univ.*, 765 N.W.2d 428, 433

(Minn. Ct. App. 2009) (MHRA retaliation).

Taylor complained to Jensen, Haukaas, and Burns on various occasions before 2007

about sex discrimination.  But, while there is evidence that her complaints were not taken

seriously, there is no evidence that Fridley took adverse employment action because of those

complaints.

---

[18]Employment-discrimination claims, including claims of retaliation, need not be analyzed under the *McDonnell Douglas* burden-shifting framework when the plaintiff presents strong or "direct" evidence of discrimination.  *See Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1039-42 (D. Minn. 2008).

Fridley did, however, fire Taylor in March 2007, roughly a month after she complained to Burns of sex and disability discrimination. For purposes of its summary-judgment motion, Fridley concedes that Taylor complained of discrimination to Burns on February 7, 2007, and that Fridley took an adverse employment action when it fired her. Def. SJ Mem. at 38. But Fridley argues that because her meeting with Burns was "over one month before her termination for refusing to perform her duties," the meeting was not "temporally related to her termination." *Id.* Fridley also argues that "there is no evidence that the reason for her termination was false," and that Taylor therefore cannot demonstrate that Fridley's proffered reason for firing her was pretextual. The Court disagrees on both points.

As to the timing, Fridley tells only part of the story. Taylor was not just fired a month after meeting with Burns. Haukaas orally reprimanded Taylor for meeting with Burns *one day* after the meeting, despite the fact that Jensen — Taylor's immediate supervisor, and the person generally responsible for disciplining Taylor and keeping track of her whereabouts — did not bring the meeting to Haukaas's attention. A few days later, Haukaas reprimanded Taylor again — this time in writing, and in front of her coworkers — for having met with Burns (as well as for having taken a day off after being orally reprimanded by Haukaas and threatened with termination). By all accounts, Haukaas's written reprimand of Taylor was unprecedented. And, of course, Taylor was fired by Haukaas about a month later. Under the circumstances, a reasonable jury could conclude that Taylor was fired in retaliation for having complained about discrimination to Burns.

Further, a reasonable jury could conclude that Fridley's stated reason for firing Taylor — her refusal to chip — was pretextual. In his December 2006 IME report, Mandel said that if

Taylor did any trimming or chipping, "she should have close follow-up before and during the tree trimming/chipping activities by an occupational physician." Def. Ex. 14 at 6. Based on what Jensen told Taylor about when she would be chipping, Taylor scheduled a doctor's appointment on Monday, March 19, after she was scheduled to chip, precisely so that she could have the "close follow-up" that Mandel had recommended. But Haukaas insisted that Taylor do chipping on Friday, March 16, despite Mandel's statement that Taylor needed medical follow-up "before and during" any further chipping, despite Haukaas's knowledge of Taylor's doctor's appointment on Monday, and despite Taylor's willingness to do other work on that Friday afternoon. Further, Haukaas insisted that Taylor wear the PAPR despite the concerns that she had expressed about her safety while wearing the unit, despite the suggestion by Mann (an occupational physician) that Fridley's safety people should be consulted before Taylor wore a PAPR while chipping, and despite the fact that Haukaas never talked to a safety consultant. *See* Pl. Ex. F. Under these circumstances, a jury could readily find that Fridley's stated reason for firing Taylor — that she would not chip until Monday — was false, and that Taylor was really fired in retaliation for complaining of sex and disability discrimination.

## C. Disability Discrimination

The ADA forbids employers to take adverse action against employees because of disability. 42 U.S.C. § 12112(a). The ADA also requires employers to make reasonable accommodations to enable disabled employees to do their jobs if the employer can do so without undue hardship. 42 U.S.C. § 12112(b)(5)(A). The MHRA contains analogous requirements. Minn. Stat. § 363A.08 subds. 1 & 6. Because the ADA and the MHRA are analyzed similarly, the Court will discuss only the ADA, except when there is reason to distinguish between the

statutes.  *See Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. Minn. 2004) (discussing differences between MHRA and ADA).

It is unclear from Taylor's complaint exactly what type of disability-discrimination claim she brings.  She could be bringing an adverse-action claim on the basis that she was fired because of a disability, or she could be bringing a failure-to-accommodate claim on the basis that Fridley failed to accommodate her disability.  In its summary-judgment brief, Fridley characterizes Taylor's claim as a failure-to-accommodate claim.  Def. SJ Mem. at 27 & n.6.  Taylor does not dispute this characterization, and indeed seems to agree that she is bringing a failure-to-accommodate claim.  Pl. SJ Opp. at 47-49.  The Court therefore treats Taylor's ADA claim as a claim that Fridley failed to reasonably accommodate her disability.

There is no dispute that Taylor had health problems when exposed to wood dust.  She asked Fridley to accommodate those problems by excusing her from chipping duty.  Fridley tried to accommodate those problems by fitting her with a respirator.  But the fact that Fridley voluntarily offered Taylor this particular accommodation does not mean that Fridley was required by the ADA or the MHRA to offer Taylor this or any other accommodation.  Fridley was not legally required to accommodate Taylor unless her health problems amounted to a disability.

An employee is considered disabled under the ADA and the MHRA if one of three things is true:  (1) she is actually disabled — that is, she has a physical or mental impairment that "substantially limits" (under the ADA) or "materially limits" (under the MHRA) a major life activity; (2) she has a record of such an impairment; or (3) she is "regarded as" having such an impairment.  42 U.S.C. § 12102(2); Minn. Stat. § 363A.03 subd. 12.  The "materially limits"

standard under the MHRA is less stringent than the "substantially limits" standard under the ADA. *Kammueller*, 383 F.3d at 784.

The Eighth Circuit held in *Weber v. Strippit, Inc.* that a failure-to-accommodate claim cannot be brought under the ADA by an employee who is not *actually* disabled, but who is only *regarded as* disabled by his or her employer. 186 F.3d 907, 917 (8th Cir. 1999). The Eighth Circuit reasoned that, in the absence of an actual disability, it makes no sense to compel employers to make accommodations that are in fact unnecessary. *Id.* This Court agrees with the United States District Court for the Northern District of Iowa that *Weber*'s logic extends to situations in which the employee is not actually disabled, but has a *record* of disability. *Martinez v. Cole Sewell Corp.*, 233 F. Supp. 2d 1097, 1132 (N.D. Iowa 2002). Further, although the parties have not addressed the question, the Court believes that Minnesota courts would follow *Weber* (and *Martinez*) in interpreting the MHRA. *See McLain v. Andersen Windows, Inc.*, No. 06-4389, 2007 U.S. Dist. LEXIS 15934, at *10-11, 2007 WL 710173, at *4 (D. Minn. Mar. 6, 2007) (holding that "the logic of *Weber* applies to claims under the MHRA").

Taylor's failure-to-accommodate claim therefore turns on whether, when Taylor was working for Fridley, she was actually disabled under the ADA or the MHRA. Clearly, when Taylor was exposed to wood dust, she had difficulty breathing and suffered other symptoms (such as headaches and congestion) that made her extremely uncomfortable. But the five medical records in evidence and Taylor's testimony do not permit a jury to conclude that Taylor was substantially or materially limited in a major life activity.

The February 2006 and April 2006 notes from Kapsner provided a diagnosis of allergic rhinitis, wheezing, and coughing, and directed Taylor to avoid exposure to wood dust and to

refrain from chipping.  Def. Exs. 9, 11.  In his December 2006 IME report, Mandel described

Taylor as being "in good health and . . . not symptomatic with any respiratory problems," as

having "non-specific rhinitis" related to exposure to wood dust, and as being restricted in her job

only with respect to tree trimming and wood chipping.  Def. Ex. 14 at 4-6.  Mann, who saw

Taylor in February 2007, simply assumed that Taylor had asthma related to exposure to wood

dust; Mann did not offer an independent opinion on her medical condition, apart from saying that

Taylor could safely wear a respirator.  Pl. Ex. F.  Finally, King-Biggs stated in a brief note that

she evaluated Taylor in March 2007 "for symptoms of difficulty breathing and nasal congestion

while exposed to wood dusts" and that a tentative diagnosis of "asthma with rhinitis" could not

be established without further testing.  Pl. Ex. G.

      The medical evidence supports only a finding that Taylor had asthma or rhinitis that was

triggered by exposure to wood dust.  And at her deposition, when asked what disability she had

when working for Fridley, Taylor responded, "I cannot be around sawdust without an allergic

reaction."  Taylor Dep. at 90.  Taylor did say that, at the time of her deposition, she was taking

medications for asthma and occasionally used an inhaler when exposed to car exhaust, cold air,

perfume, or a lot of grass clippings.  Taylor Dep. at 92-97.  But Taylor's deposition was taken

two years after she was fired by Fridley, and Taylor's deposition testimony would not allow a

reasonable jury to conclude that, when Taylor worked for Fridley, she had anything other than

sawdust-related asthma or rhinitis.  Under *Land v. Baptist Medical Center*, such a limited allergic

reaction does not substantially limit a person's major life activities for purposes of the ADA.

164 F.3d 423, 425 (8th Cir. 1999); *see also Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723-24

(2d Cir. 1994) (holding that plaintiff with work-aggravated asthma was not disabled under the

Rehabilitation Act with respect to either breathing or working); *Miller v. AT&T Network Sys.*, 722 F. Supp. 633, 639-40 (D. Or. 1989), *aff'd*, 915 F.2d 1404 (9th Cir. 1990) (holding that plaintiff with asthma that prevented working in extreme temperatures was not substantially limited with respect to working under Oregon anti-discrimination law).

As noted, an employee who is not considered disabled for purposes of the ADA because her impairment does not "substantially" limit a major life activity may nevertheless be considered disabled under the MHRA if her impairment "materially" limits such an activity. Minn. Stat. § 363A.03 subd. 12; *Kammueller*, 383 F.3d at 784. Taylor has not, however, argued that a jury could find her to have been disabled under the MHRA but not under the ADA. *See* Pl. SJ Opp. at 43-45. Instead, Taylor began her discussion of the severity of her impairment by saying: "The evaluation of 'substantially limited' means to be significantly restricted as compared to an average person in the general population." *Id.* at 43. Because Taylor did not argue that a jury could find that she was "materially" limited in a major life activity (even if she was not "substantially" limited in the same activity), the Court finds that Taylor has forfeited any such argument. Moreover, the Court doubts that a reasonable jury could find that Taylor's sawdust-related asthma or rhinitis caused her to be "materially" limited in a major life activity. The Court therefore grants summary judgment to Fridley on Taylor's failure-to-accommodate claim under the MHRA for the same reasons that the Court grants summary judgment to Fridley on Taylor's analogous claim under the ADA.

### D. Sex Discrimination

Title VII forbids employers to discriminate against employees based on sex.  42 U.S.C. § 2000e–2(a)(1).  Maintaining a sexually hostile work environment is a type of sex discrimination.  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).  The MHRA's prohibitions on sex discrimination parallel those of Title VII.  *See* Minn. Stat. §§ 363A.03 subd. 2 (prohibiting sex discrimination), 363A.03 subd. 13 (defining discrimination based on sex to include sexual harassment), 363A.03 subd. 43 (defining sexual harassment); *Frieler v. Carlson Mktg. Group*, 751 N.W.2d 558, 564-65 (Minn. 2008) (discussing Title VII and the MHRA).

In Count One of her complaint, Taylor alleges both that she was fired because she was a woman and that she was subjected to a sexually hostile work environment while working in the streets division.  Compl. ¶¶ 38-42.  Fridley moves for summary judgment, arguing that Taylor was not qualified for her job, that any sexual harassment was insufficiently severe to qualify as sex discrimination, and that there is no evidence that Taylor's sex motivated her firing.[19]  Def. SJ Mem. at 16-26.  The Court disagrees on all points.

---

[19]In its summary-judgment brief, Fridley also argued that Taylor's sexual-harassment claim was time-barred because many of the incidents she complained of happened more than 300 days before she filed her EEOC complaint.  Def. SJ Mem. at 16-18.  But as Fridley's counsel acknowledged at oral argument, Fridley's timeliness argument is inseparable from its argument on the merits that whatever harassment Taylor suffered was not sufficiently severe or pervasive to be actionable.  If the actions of which Taylor complains amounted to sexual harassment, then they also amounted to the kind of continuing violation that is not barred by the statute of limitations.  *See Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 229 (8th Cir. 1996) ("A hostile work environment is an ongoing nightmare for the employee victim, in legal parlance, a 'continuing violation.'").  Because the Court finds that a question of fact exists about the severity and pervasiveness of the harassment, the Court also declines to find, on summary judgment, that Taylor's sexual-harassment claim is time-barred.

Fridley's argument that Taylor was unqualified hardly merits comment. Taylor did her job well for ten years, until she developed a sensitivity to wood dust that interfered with her ability to do one particular task — a task that was one among many, that was not even listed in the city's official job description, and that at least three other streets-division field workers rarely did. In any event, Fridley's argument that Taylor was unqualified hinges on its assertion that Taylor "refused the accommodations the City proposed which would have enabled her" to do chipping. Def. SJ Mem. at 19. But Taylor did not altogether refuse to chip while wearing a PAPR. She simply refused to try chipping for the first time while wearing a PAPR on a Friday, when she had no scheduled doctor's appointment, and agreed to try it instead on the following Monday, when she did have a doctor's appointment and could receive the "close follow-up" that her doctor had recommended.

The Court also finds that the pervasiveness and severity of whatever sexual harassment Taylor endured is a question of fact for the jury. If Taylor's evidence is taken as true, she was given less training than her male coworkers, was treated with less respect by her superiors, was shunned by her coworkers, was excluded from meetings at which important information was shared, was surrounded by sexually suggestive material that was brought to work by more-senior employees (including Jensen, her supervisor), heard coworkers make demeaning statements about women on a regular basis, saw coworkers go out of their way to ogle women, and was treated dismissively when she complained to her superiors. The Court finds that Taylor has provided evidence of more than "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).

Finally, Taylor provided evidence that supports her claim that she was fired because of her sex. For ten years, Taylor was the only woman in a male-dominated workplace, and, as detailed above, suffered what the jury could find was pervasive and severe harassment on account of her sex. No one — not Jensen, not Haukaas, not Burns — took Taylor seriously when she complained of sex discrimination. Haukaas's and Burns's dismissive handling of Taylor's complaints of sex discrimination are evidence that they were biased against her because of her sex. Further, given how utterly unreasonable it was for Haukaas to fire Taylor — a ten-year employee with a good record — for refusing to chip on a Friday despite her willingness to chip on the following Monday, a reasonable jury could find that Haukaas's stated reason for firing Taylor was pretextual. Under these circumstances, Fridley is not entitled to summary judgment on Taylor's claim that she was fired because of her sex. *Cf. Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    The motion of defendants City of Fridley and Jon Haukaas for summary judgment [Docket No. 8] is GRANTED IN PART as follows:

a.  With respect to defendant Jon Haukaas, all of plaintiff's claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

b.  Plaintiff's claim for assault and battery as set forth in Count Four of the complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

c.  Plaintiff's claim for negligence as set forth in Count Five of the complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

d.  To the extent that plaintiff brings claims for "aiding and abetting" the substantive claims brought in the complaint, plaintiff's "aiding and abetting" claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

e.  Plaintiff's claim for disability discrimination under the ADA and the MHRA as set forth in Count Two of the complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

2.  The motion of defendants for summary judgment is DENIED in all other respects.


Dated: September 15, 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge